IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DANA THOMPSON, | ) | |
| | ) | |
| Claimant, | ) | No. 13-cv-8691 |
| | ) | |
| v. | ) | Jeffrey T. Gilbert |
| | ) | Magistrate Judge |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Dana Thompson ("Claimant") brings this action under 42 U.S.C. § 405(g) against Respondent Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), seeking review of the Commissioner's decision denying her applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 9.]

Claimant has moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment. [ECF No. 21.] The Commissioner has also moved for summary judgment. [ECF No. 29]. For the reasons stated below, Claimant's motion for summary is granted. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

# I. PROCEDURAL HISTORY

Early in 2011, Claimant filed applications for disability insurance benefits and supplemental security income, respectively. (R. 158-160, 160-173). The Social Security Administration denied these claims initially on May 20, 2011, and on reconsideration on August 4, 2011. (R. 83, 84, 103, 113.) Roughly one month later, on September 12, 2011, Claimant requested an administrative hearing. (R. 120.) An Administrative Law Judge (the "ALJ") held the hearing on June 13, 2012. (R. 32.) At that hearing, Claimant, who was represented by counsel, appeared and testified. *Id.* A medical expert (the "ME") and a vocational expert (the "VE") also appeared and testified. *Id.*

On July 13, 2012, the ALJ issued a written decision. (R. 12-24.) In the decision, the ALJ went through the five-step sequential evaluation process and ultimately found Claimant not disabled under the Social Security Act. (R. 24.) At step one, the ALJ found that Claimant had not engaged in substantial gainful activity ("SGA") since the alleged onset date. (R. 14.) At step two, the ALJ found that Claimant had the severe impairments of major depressive disorder, myalgia/arthralgia, iron deficiency anemia, hypothyroidism, and fibromyalgia. *Id.* At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1526, 416.920(d), 416.925, and 4416. 926(d)). (R. 15.)

Before step four, the ALJ found that Claimant had the residual functional capacity ("RFC") to do sedentary work. (R. 16.) The ALJ determined that Claimant was limited to jobs that required no more than: (1) frequently lifting/carrying five pounds; (2) occasionally lifting/carrying ten pounds; (3) sitting eight hours per workday; (4) standing three hours per

2

workday; (5) walking three hours per workday; (6) occasionally bending, kneeling, or stopping; (7) occasionally climbing ramps or stairs; and (8) never climbing ladders, ropes, or scaffolds. (R. 16-17.) The ALJ also found that Claimant should avoid hazards, such as unprotected eights and dangerous machinery. (R. 17.) Based on this RFC, the ALJ determined at step four that Claimant could not perform any past relevant work. (R. 23.) Finally, at step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could perform. *Id.* Specifically, the ALJ found Claimant could work as an information clerk, a general office clerk, and an order clerk. (R. 24.) The ALJ also found that Claimant could perform this work if she were limited to unskilled work. *Id.*

Because of this determination, the ALJ found that Claimant was not disabled under the Social Security Act. (R. 24.) On July 13, 2012, Claimant sought review of the ALJ's decision. *See* R. 1. On October 16, 2013, the Social Security Appeals Council denied the request. *Id.* That denial made the ALJ's opinion into the final decision of the Commissioner. *Id. See also Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Claimant now seeks review in this Court pursuant to 42 U.S.C. § 405(g). *See Haynes v. Baumhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Judicial review of the ALJ's decision is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms*, 553 F.3d at 1097.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere

scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

### III. ANALYSIS

Claimant asserts that there are three problems with the ALJ's decision. First, the ALJ erred in determining Claimant's RFC. Second, the ALJ improperly evaluated Claimant's credibility. Third, the ALJ's hypothetical questions directed to the VE did not account for all of Claimant's limitations. Because the ALJ made the first error, the Court need not address the other two.

**1. The ALJ Improperly Evaluated the Medical Opinions of Claimant's Treating Physicians.**

Dr. Anthony Mimms, one of Claimant's treating physicians, provided a Medical Assessment of Ability to Do Work-Related Activities. (R. 520-523.) The ALJ noted that Dr.

4

Mimms' opinion about Claimant's "exertional and postural limitations" are "generally consistent with those" found by the ALJ. (R. 21.) But the ALJ gave little weight to Dr. Mimms' opinion that Claimant would have good and bad days, causing her to miss about three workdays per month. (R. 21, 523.) The ALJ asserted that the opinion "primarily" relied on Claimant's subjective complaints of pain. (R. 21.) The ALJ does not explain how he concluded that Dr. Mimms relied on Claimant's self-reports when opining how many absences Claimant would have. That appears to be because this determination was based entirely on speculation. Dr. Mimms did not write, as this Court has seen other doctors do, "per claimant's report," or provide any similar indication that his opinion was based on Claimant's subjective complaints. And no question in the report asked Dr. Mimms what the basis was for this opinion. The Commissioner has not defended this basis for discounting Dr. Mimm's opinion.

The ALJ also criticized Dr. Mimm's Medical Assessment as contrary to the evidence as a whole and to Dr. Mimms' own findings. *Id.* The ALJ relied on this same reason when giving little weight to Dr. Mimms Medical Verification of Physical Impairment report, even though Dr. Mimms noted in this form that his opinion was based on his "physical eval[uations]" and "objective and subjective findings." (R. 21, 624-625.)

The ALJ's characterization of Dr. Mimms' findings as contrary to his opinion is not borne out by Dr. Mimms' treatment notes. On January 15, 2010, Dr. Mimms saw Claimant for the first time. The doctor noted that Claimant had significant pain which she was struggling to control with medication. (R. 485-86, 488). He performed a physical examination and determined that Claimant had "notable tenderness in the low lumbar spine around sacroiliac joint, lateral hips, medial aspects of the elbow, and medial aspects of the knees bilaterally" and that she "walk[ed] extremely slow and takes small jerky steps secondary to her pain." (R. 486.)

5

Dr. Mimms concluded that Claimant's fibromyalgia "significantly affect[ed] her daily activity." *Id.*

Dr. Mimms saw Claimant again on February 16, and reported that she was still struggling with pain and that the current medication regimen was not entirely effective. (R. 484.) In March, Dr. Mimms notes were largely the same, documenting Claimant's pain and issues with medication, which caused her to feel like "crap." (R. 483.) In May, Dr. Mimms noted significant improvement in Claimant's condition. (R. 482.) But the very next week there was "new pain all over" and Claimant was crying. (R. 481.) So Dr. Mimms recommended that Claimant take ten days off of work. (R. 480.) Then, two months later, Claimant was doing well again. (R. 479.) But this also was short-lived. Claimant returned in September with more problems and now was unable to ride a bike or lift a young child. (R. 478.) In October, Dr. Mimms wrote a letter explaining that Claimant's fibromyalgia had led to increased pain. (R. 477.) Early the following year, Claimant stopped skating because of the pain and had more issues with the effectiveness of her medication. (R. 476.) In May, 2011, Dr. Mimms noted that Claimant's pain was down and her ability to function was improved, but she still did not feel good, and her children had to take care of her. (R. 475.) Throughout Dr. Mimms' notes, he reported no sensory loss, but some motor loss and significant weakness in reflexes. (R. 476-483.)

These notes are not clearly inconsistent with Dr. Mimms' determination that Claimant likely would miss about three workdays per month. Indeed, "a patient who suffers from a chronic condition and who undergoes years of treatment is bound to have good days and bad days." *McKinney v. Colvin*, 2014 WL 7332831, at *3 (N.D. Ill. Dec. 22, 2014). More specifically, Dr. Mimms' notes demonstrate that Claimant had a diagnosed physical condition

6

that was causing her significant pain that in turn impacted her physical abilities. Moreover, the notes make clear that Claimant's condition fluctuated significantly, particularly because of the ongoing struggle to tailor an appropriate medication regimen. Therefore, these notes are not necessarily inconsistent with the opinion that Claimant has good and bad days and that she has at least three bad days per month on which she cannot work.

"If the ALJ concludes that the treating physician's opinion is inconsistent with other evidence, she must explain the inconsistency." *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 819 (N.D. Ill. 2006). *See Fischer v. Barnhart*, 256 F. Supp. 2d 901, 907 (E.D. Wis. 2002); *see also Barthelemy v. Barnhart*, 107 F. App'x 689, 693 (7th Cir. 2004); *Ulloa v. Barnhart*, 419 F. Supp. 2d 1027, 1036 (N.D. Ill. 2006). In this case, however, the ALJ offered no more than a conclusory assertion that inconsistencies existed. The ALJ did not identify what inconsistences in Dr. Mimms' notes demonstrated that Claimant (1) did not have bad days, (2) did not have at least three bad days a month, or (3) would be able to work on her bad days. Therefore, the ALJ did not connect the dots between Dr. Mimms' findings and the supposed inconsistencies in his opinion. Instead, the ALJ simply disagreed with Dr. Mimms' assessment of the medical findings contained in his own progress notes.

The Commissioner has not done much better in defending the ALJ's decision. Her only defense is that Dr. Mimms' initial evaluation of Thompson showed "no signs of weakness or sensory loss" and that Claimant was treated with medication. [ECF No. 30, at 11.] The former point is not a reason for discounting an opinion given after a year-long treatment relationship, particularly where weakness and sensory loss are not the basis for the opinion. The latter cannot justify disregarding a treating physician's opinion when that physician's opinion and treatment notes extensively document problems with the effectiveness of Claimant's medications.

7

Dr. Scott Renshaw, another one of Claimant's treating physicians, also provided a Medical Assessment of Ability to Do Work-Related Activities. (R. 516-519.) In this assessment, he conveyed many opinions, including an opinion that Claimant would miss more than four days of work per month because of her impairments or treatment. (R. 519.) The ALJ determined that "[c]ertain aspects of [Dr. Renshaw's] opinion are in fact consistent or even a higher level than the residual functional capacity assessment in this decision." (R. 20.) But the ALJ gave partial weight to Dr. Renshaw's opinion about how many workdays Claimant would miss because: (1) that opinion "appears to have" been based "quite heavily on the claimant's subjective complaints of pain," and (2) Dr. Renshaw's findings are not consistent with his opinion. *Id.* The ALJ again did not explain what in the record indicated that Dr. Renshaw relied on Claimant's self-reports when opining how often Claimant would be absent from work. And, again, the Commissioner has not provided any defense of this determination.

Further, the ALJ failed to identify the specific inconsistences between Dr. Renshaw's findings and his opinions. And there are not clear inconsistencies. Dr. Renshaw noted in November, 2009, that Claimant "look[ed] miserable" and was suffering from such significant pain because of her fibromyalgia that she could not go to church. (R. 405.) In December, the pain had not abated and Claimant was "tearful." (R. 403.) He continued to note problems. (R. 397.) In late 2010 to early 2011, Dr. Renshaw began to record issues with depression, sleep, fatigue, and appetite. (R. 395, 397.) A few months later, Claimant continued to struggle with depression and anxiety, and had thoughts of suicide. (R. 504, 505). Throughout all of these notes, Dr. Renshaw devoted significant attention to the difficulty of crafting an appropriate medication regimen.

Dr. Renshaw's findings are not clearly inconsistent with his opinion that Claimant likely

8

would have good and bad days that would result in missing more than four workdays per month. His treatment notes consistently reflect that Claimant had real problems that oscillated in their significance. The notes show that Dr. Renshaw struggled to help Claimant control these issues with medication, in part contributing to the volatility of her condition. The ALJ was responsible for identifying inconsistencies. *Frobes*, 467 F. Supp. 2d at 819. The ALJ did not do so, but, rather, "inappropriately substituted her own judgment for that of [Claimant's] treating physicians" without "explain[ing] how the opinions of [Claimant's] treating physicians were either internally inconsistent or not consistent with other evidence." *Singleton v. Astrue*, 2008 WL 425528, at *6 (N.D. Ind. Feb. 13, 2008). This error merits remand. *Id.*

## 2. The ALJ Improperly Evaluated the Medical Opinion of Dr. Ibrar Paracha.

Dr. Ibrar Paracha performed a consultative examination of Claimant on May 12, 2011. Dr. Paracha noted that Claimant had normal posture and gait, was able to do heel and toe walking and walk in tandem (both without difficulty), and could get on and off the exam table (again without difficulty). (R. 458.) He also stated that she had generally good range of motion and muscle strength as well as a negative straight leg test. *Id.* But Dr. Paracha also reported that Claimant had hip pain that caused difficulty squatting and getting up from a squatting position. *Id.* Further, he detailed that Claimant had "tenderness to palpation in the shoulders and hips." *Id.* Unsurprisingly, Claimant had decreased ranges of motion in both her hips and her shoulders. *Id.* Dr. Paracha determined that the physical exam was "evident of lumbar spinal pain, shoulder pain, and hip pain." *Id.* He concluded that Claimant "will likely have difficulty with extensive strenuous activities" and that she could do some sort of work part-time, "but may have difficulty working full-time." *Id.*

9

The ALJ disregarded this opinion in a conclusory fashion by asserting, "The opinion that the claimant might have difficulties working full time was given little weight because it is generally inconsistent with this doctor's examination, which was essentially unremarkable for significant impairment." (R. 21.) The Commissioner's only defense of this conclusory contention amounts to a repetition of Dr. Paracha's findings and the ALJ's characterization of them. This is not enough. It is true that Dr. Paracha found that Claimant was not limited in many areas. But he also determined that she suffered from significant pain that could impact her ability to work full time. This opinion was based not only on Claimant's subjective complaints, but also on the physical exam conducted by a medical professional. The ALJ failed to explain how this portion of Dr. Paracha's opinion was undercut by the fact that he did not find Claimant limited in every area.

### 3. The ALJ Failed to Build a Logical Bridge Connecting Claimant's Mental Limitations to Her Ability to Work.

Claimant contends that the ALJ did not adequately account for all of her mental limitations. The ALJ found that Claimant had a moderate limitation in concentration, persistence, or pace. (R. 16.) But the ALJ only accounted for this limitation by restricting Claimant to work that did not involve "hazards." (R. 24.) The ALJ never found that Claimant's mental limitation was only triggered by exposure to hazards. And it is not self-evident how this work restriction accounted for Claimant's mental limitation. In fact, it seems unlikely that the work restriction would do so because the evidence cited by the ALJ when finding that Claimant had the moderate limitation indicated more generalized problems with concertation and persistence, such as difficulties focusing on written instructions. (R. 16.) The ALJ had the duty to build a logical bridge connecting Claimant's mental limitations to the work restrictions in the RFC. The failure to do so was an error.

The Commissioner mounts a poor defense of this error. She notes that the ALJ accounted for the mental limitation with the hazards restriction. As explained above, that cannot be the basis for upholding the ALJ's decision. The Commissioner also points out that the ALJ stated, "even if the claimant were further limited to unskilled work" she still would not be disabled. (R. 24.) Again, though, the ALJ failed to explain how restricting Claimant to unskilled work accounted for her mental limitation. The Commissioner cites case law indicating that a restriction to unskilled work *may* account for such mental limitations. But none of that case law stands for the proposition that it always does. *See Webb v. Colvin*, 2015 WL 9474289, at *2-5 (N.D. Ill. Dec. 28, 2015) (discussing how an ALJ can account for moderate limitations in concentration, persistence, and pace when formulating an RFC and when questioning a VE); *see also Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009); *Willis v. Colvin*, 2016 WL 270234, at *3-4 (N.D. Ill. Jan. 21, 2016). Therefore, these cases cannot relieve the ALJ of the duty to build a logical bridge connecting Claimant's mental limitations to her ability to work.

## IV. CONCLUSION

For the reasons stated above, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: March 1, 2016